IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

STEPHEN WEIL,                         :
                                      :     Case No. 4:12-CV-00413
              Plaintiff,              :
                                      :
                                      :     (Judge Brann)
       v.                             :
                                      :
DR. DAVID I. WHITE, WALT              :
EISENHAUER, ANNA MAE                  :
SMITH, JOHN LEFFERT,                  :
DR. MICHAEL GREENBERG,                :
DR. DEBORAH ERICKSON,                 :
LANE BOWER, and                       :
DR. MARY ROSE-COLLEY,                 :
                                      :
              Defendants.             :

## MEMORANDUM
October 24, 2014

Before the Court is the Defendants' Motion for Summary Judgment (ECF No. 52) on Plaintiff's Amended Complaint (ECF No. 2). Plaintiff, a former Physician Assistant Program student at Lock Haven University, filed this civil rights action alleging unconstitutional retaliation for his lawful exercise of free speech rights protected by the First Amendment to the United States Constitution. For the reasons that follow, the Defendants' Motion is granted and the Plaintiff's claims are dismissed.

## I.     BACKGROUND

The following laborious narrative presents the relevant facts and background information for this summary judgment determination.

Plaintiff Stephen Weil ("Plaintiff" or "Weil") is a former Physician Assistant (PA) Program student at Lock Haven University ("LHU"), an institution in the Pennsylvania State System of Higher Education.  Defs.' Stat. Facts, ¶ 1, Nov. 19, 2013, ECF No. 54 [hereinafter Defs.' SOF].  The PA program is typically twenty-four (24) months in duration and leads to a Masters of Health Science Degree and a certificate as a Physician Assistant.  Id., ¶ 11.  The first year of the PA Program is devoted to classroom instruction (the didactic year); the second year is divided into five six-week clinical rotations, followed by an eighteen-week period of clinical training work in physician-supervised practices known as a preceptorship.  Id., ¶ 12.

Weil's first unconventional contact with Lock Haven University officials occurred in April 2009, when members of the faculty asked Weil to attend a meeting because they had some concerns about him.  Id., ¶ 16.  The faculty presented Weil with a document, known as a behavioral contract, which detailed the faculty members' concern with his conduct.  The concerns included allegations that he was frequently late for class, had been absent without permission,

2

demonstrated a lack of sensitivity toward team members when working in a group, and behaved unprofessionally by repeatedly confronting faculty members.  Id., ¶¶ 17, 18.  Weil acknowledged that he understood that "continued violations of PA Program policies and procedures will result in disciplinary action including the possibility of grade reduction, suspension from the program and/or dismissal." Id., ¶ 19.  While both the faculty and Weil signed the contract, Weil disputed the accuracy of some of the factual allegations and wrote a rebuttal.  Id., ¶¶ 19–20.

Weil began his series of five clinical rotations in May 2009.  Id., ¶ 22. During his fourth rotation, on October 17, 2009, Weil and his wife were in an automobile accident in which he sustained injuries.  Id., ¶ 123.  Weil was able to complete his fourth rotation, but had difficulty during his fifth rotation and was granted medical leave.  Id., ¶¶ 23, 25.  According to PA Program policy, extended absences for any reason may require additional didactic and/or clinical assignments, repetition of a course, extension of the length of the program, postponement of graduation, or termination from the program, all at the discretion of the program director.  Id., ¶ 26.  Because of the time Weil missed from the PA program, the faculty required that he complete and pass a written exam and conduct a physical examination, which he successfully completed.  Id., ¶ 27.

When Weil returned from the leave of absence, he did not resume his fifth

clinical rotation, but started the first nine week segment of his eighteen-week

preceptorship.  Id., ¶ 28.  The course was scheduled to begin in January 2010, but

Weil instead began in March 2010 due to his medical complications.  Id., ¶¶

28–29.  Weil planned to complete the second nine-week segment of the

preceptorship over the summer, necessitating the entry of a grade of Incomplete

("I") on his transcript at the conclusion of the Spring Semester 2010, which would

be changed to the appropriate letter grade upon completion of the preceptorship in

August 2010.  Id., ¶ 30.  A student who receives an Incomplete for a course must

complete the requirements or outstanding work for that course by the middle of the

following semester, or the Incomplete automatically becomes an "E" unless an

extension is arranged.  Id., ¶ 31.  In June 2010, at the prompting of LHU's

registrar, Defendant John Leffert, a member of the PA Program faculty and Weil's

clinical adviser, changed the Incomplete grade to a "C" as a placeholder to prevent

Weil from losing his financial aid until the actual grade was entered after Weil

completed the rotation.  Id., ¶¶ 333–35.

On June 21, 2010, Weil began his second and final nine-week clinical

rotation for the preceptorship at Clinton Medical Associates (CMA), a private

primary care medical group situate in Clinton County, Pennsylvania.  Id., ¶ 36.

Weil was assigned Defendant Michael Greenberg, M.D., as preceptor.  Id.

4

Greenberg is the president and CEO of Clinton Medical Associates, which is his primary occupation.  Id., ¶ 2.  Greenberg is also the medical director for LHU's PA Program, a position he has held since 1996 with duties that include: assisting the PA Program Director; providing medical guidance regarding the content of the curriculum; acting as a liaison with the medical community; and lecturing students in both the didactic and clinical components of the program.  Id., ¶ 2.

Nadine McGraw is a Physician Assistant employed by CMA who also worked with Weil.  Id., ¶ 37.  Weil believed that both McGraw and Greenberg were upset about Weil's behavior during the first two weeks at CMA.  The Parties differ in their conflicting explanations for this dispute.  Greenberg and McGraw maintain that Weil engaged in a number of inappropriate acts including insubordinate behavior towards superiors, rudeness towards patients, and medical incompetence.  Id., ¶¶ 38–40.

Weil claims that he was not surprised by McGraw and Greenberg's adverse reaction to his presence because, as he alleges, he observed medical and ethical irregularities occurring at CMA and began to voice his concerns with these practices.  Specifically, Weil alleges that he observed fraudulent practices by McGraw and Greenberg, which included recording findings in patients' charts that did not exist in order to bill insurance companies for the corresponding tests.  Pl.'s

Stat. Facts ¶ 38, Jan. 6, 2014, ECF No. 63 [hereinafter Pl.'s SOF].

The discord surfaced on Wednesday of Weil's second week at CMA, June 30, 2010, when McGraw told Weil that she did not want him to accompany her to visit patients because she was concerned about his behavior and general incompetence.  Defs.' SOF, ¶ 39.  That same day, McGraw sent an email to Defendants Walter Eisenhauer,[1] Lane Bower,[2] Anna Mae Smith,[3] and Greenberg, informing them that Weil was no longer permitted to see patients with her and setting forth reasons for the decision, including: that he had been rude to McGraw, the nursing staff and patients; he had "diagnosed" patients with conditions and told them his diagnosis without checking with his preceptor, causing unnecessary stress and alarm; he questioned other providers' office notes and was judgmental of them; he frequently left early, came in late, and requested time off; he was generally unwilling to work and had a poor attitude that rendered him incapable of learning.  Id., ¶ 40.  Based on McGraw's complaints and refusal to work with him,

_____

[1] Walter Eisenhauer is a member of the LHU PA Program faculty and the Department Chair.  He also works as a PA at CMA approximately four hours per week, but is not an employee of CMA.  Defs.' SOF, ¶ 4.

[2] Lane Bower is a member of the LHU PA Program faculty and a clinical coordinator for the program.  As clinical coordinator, she establishes and maintains clinical sites for students, makes site visits, and fields questions by students, faculty, and preceptors.  Id., ¶ 7.

[3] Anna Mae Smith is a member of the LHU PA Program faculty, and is presently the Program Director.  She also works as a PA at CMA approximately four hours per week, but is not an employee of the practice.  Id., ¶ 5.

Weil was suspended from the CMA rotation and told to report to Eisenhauer to discern the nature of the problems.  Id., ¶ 41.

Weil spoke with Eisenhauer the following day and reported that he had ethical concerns with certain practices at CMA.  He felt that he was singled out because of his knowledge of and opposition to those practices.  Id., ¶ 43; Pl.'s SOF, ¶ 43.  Following this meeting, on July 7, 2010, PA Program faculty members Bower, Harris and Leffert met with Weil at CMA to obtain information from McGraw about the problems she was having with Weil and to hear Weil's responses.  Defs.' SOF, ¶ 45.  This meeting was recorded and a transcript of the sound recording was produced which details both McGraw's and Weil's positions about Weil's behavior at CMA.[4]  Id., ¶¶ 46–48.

During the first weeks of July 2010, Eisenhauer prepared a second behavioral contract for Weil, which provided that he would receive an "E" grade for the 18 credit practicum, and that his continuation in the PA Program was contingent on a number of factors including: an evaluation by the LHU Office of

---

[4] One event that caused friction between McGraw and Weil was the question of whether Weil had inappropriately told a patient that he had a heart murmur, which Weil believed to be valid because it was documented in that patient's chart.  Id., ¶¶ 48–49.  When Weil pointed out that the murmur was in the notes, McGraw stated that "a lot of times that's what we have to put to pay for an echo.  So if you have a newly diagnosed hypertensive, a lot of times the insurance companies won't pay for an echo even though it should be baseline so you can see if there's LVH [left ventricular hypertrophy] because they want a physical finding."  Id., ¶ 49.

Academic Advising and Counseling and compliance with their recommendation; re-registering for the 18 credit practicum and completing the clinical experiences required for graduation; repeating all components of summative testing prior to graduation.  Id., ¶ 58.  The contract was debated among the faculty, and several members disagreed with some of its contents, namely the requirement that Weil repeat the entire 18-week preceptorship.  Pl.'s SOF, ¶¶ 57, 63.

Eisenhauer presented Weil with this contract at a meeting with most of the department faculty on July 19, 2010.[5]  Defs.' SOF, ¶¶ 59–60.  Weil did not sign the contract and was advised that he could appeal the decision by the grade appeal process articulated in the PA Program handbook.  Id., ¶ 64.  When he asked the department faculty if he was still in the PA Program, they answered affirmatively.  Id., ¶ 66.

On August 19, 2010, Bower wrote to Weil to inquire about his status because the department had not heard from him.  Id., ¶ 69.  Weil alleges that Bower provided Weil with erroneous appeal instructions in this letter.  Pl.'s SOF, ¶ 69.  On September 27, 2010, Leffert received a letter and application for graduation from Weil, who had not been in contact with PA Program faculty since

---

[5] A sound recording was also made of this meeting and the recording was transcribed. Defs.' SOF, ¶ 61.

the July 19 meeting.  Defs.' SOF, ¶ 70–71.  Leffert advised Weil by letter dated September 28, 2010 that his grade for the incomplete clinical preceptorship had been changed from C to E as planned, and that Leffert would no longer be Weil's advisor.  Id., ¶ 74.  The LHU registrar also did not approve Weil's application to graduate.  Id., ¶ 75.

On December 12, 2010, Weil brought an appeal from his E grade, which he initially sent to Eisenhauer.[6]  Eisenhauer advised Weil that the first step of the appeal should be sent to his academic adviser.  Id., ¶ 78.  Although Weil did not originally submit the appeal to Leffert because he stated that he was no longer his adviser, Leffert received the grade appeal from Weil on January 14, 2011.  Id., ¶ 79; Pl.'s SOF, ¶ 78.  Leffert denied the appeal on January 26, 2011, reasoning that the grade of E was not arbitrary or capricious because Weil had not attempted to

---

[6] As set forth in the LHU Student Handbook, if a student believes that an improper final course grade has been assigned, an appeal may be filed on the following grounds:

    1.    Clerical or mechanical error in calculation or recording of a grade.

    2.    Arbitrary and Capricious Evaluation: Significant and unwarranted deviation from grading procedures and course outlines set at the beginning of the course (ordinarily during the first week of the course) or a grade assigned arbitrarily and capriciously on the basis of whim, impulse or caprice.  The student may not claim arbitrariness and capriciousness if the student simply disagrees with the subjective professional evaluation of the instructor.

Defs.' SOF, ¶ 76; Defs.' Documents Supp. Defs.' Mot. Summ. J., Nov. 18, 2013, ECF No. 53-5, Ex. D [hereinafter Defs.' Docs.].

complete the 18-week practicum course.  Defs.' SOF, ¶ 80.  Weil then appealed the grade to Eisenhauer, who denied the appeal because Weil had not complied with the requirements the PA Program faculty set for him to complete his degree. Id., ¶¶ 81–82.

On March 4, 2011, Weil appealed Eisenhauer's decision to Mary Rose-Colley, the interim dean for the College of Education and Human Services.  Id., ¶ 83.  Weil wrote that he had observed three instances of what he believed to be billing fraud at CMA.  Id., ¶ 84.  Rose-Colley conducted an investigation including reviewing Weil's letter and the documentation he supplied, the behavior contract, the audio recordings of the July 2010 meetings, and discussing the appeal and events surrounding the appeal with Anna Mae Smith and Weil.  Id., ¶¶ 85–86. Rose-Colley did not believe Weil was a whistle-blower because he had not reported the allegations to Medicaid or Medicare authorities, but believed he was using the allegations as an excuse for his dismissal, and concluded that his grade should stand because Weil had completed only half the course.  Id., ¶¶ 87–88.

Weil then appealed to Deborah Erickson, Provost and Vice-President of Academic Affairs, referring to the fact that he had reported billing irregularities in the CMA practice to PA Program faculty members.  Id., ¶ 89.  Upon reviewing the record, Erickson granted Weil's appeal and changed his grade from an E to an

Incomplete on a temporary basis, allowing him to re-enroll with no tuition charged for the second half of the 18-week preceptorship.  Id., ¶ 90.

Before returning to the preceptorship, Weil needed to complete both a comprehensive written exam and a physical examination skills evaluation, consistent with LHU PA Program policy.  Id., ¶ 91.  By letter dated July 27, 2011, Weil wrote to Erickson to inform her of his intention to return to the PA Program. David White, who succeeded Erickson as Provost and Vice-President of Academic Affairs, acknowledged the letter and confirmed the requirements necessary to Weil's returning to the program.  Id., ¶ 93.

In August 2011, Weil informed Anne Mae Smith of his intention to return to the PA Program.  In response, Smith informed Weil that his practical examination would be the head-to-toe physical examination that he had performed at the end of the didactic year and prior to restarting the program after his accident.  Id., ¶ 97. Smith also informed Weil that the physical examination would be independently evaluated by three faculty members: one faculty member would observe the examination in person, and the other two would view a video of the examination. Id., ¶ 96.  On August 30, 2011, in response to another email from Weil, Smith informed him that, during the physical examination, if he forgot to perform any central element of the examination (such as a vital signs check, or performing the

11

abdominal exam out of order, etc.), that is grounds for immediate failure.  Id., ¶ 99.

Smith also provided Weil with the cover sheet for the examination that identified

the allotted time period and grading criteria, which were standard for all students.

Id., ¶¶100–01.

On September 15, 2011, Weil performed the practical examination, which

was videotaped.  Id., ¶ 103.  After the three faculty members independently

reviewed the examination (one with Weil, and two by videotape) and all three had

determined that Weil had failed the exam, Smith informed Weil that he had failed

the exam and set forth the reasons for his deficiencies.  Defs.' SOF, ¶¶ 104–06.

Smith advised Weil that he would be retested and if he did not meet the minimum

standards for the exam, he would be dismissed from the program.[7]  Id., ¶ 107.  In

---

[7] The Parties dispute whether each PA Program student that returns after a leave of
absence is afforded one or three opportunities to perform the practical exam correctly.  Defs.'
SOF, ¶ 94; Pl.'s SOF, ¶ 94.  The PA Program Student Handbook states:

> 6.      If on the second attempt the student is unsuccessful in completing the
>         exam the student will be counseled and provided with a written contract
>         that outlines the requirements for successful completion of the assignment.
>         A retake examination will then be scheduled at the end of the semester,
>         after the completion of all exams, on the last day of final exams week, or
>         at another end of semester time determined by the faculty.  Failure of this
>         third attempt will result in dismissal from the program.

Pl.'s SOF, Ex. C, at 24.  Notably, however, the LHU PA Program Student Handbook makes clear
that this testing policy concerns testing that was graded as part of the PA program's course work,
not testing given to ensure that a returning student's skills were sufficient to allow him to resume
the program.

response to a letter asking for clarification before taking the second exam, Smith informed Weil of the specific actions during the first exam that resulted in an automatic failure and outlined other actions or oversights that may result in an immediate failure, further emphasizing that the thirty-minute time limit was also a requirement.  Id., ¶ 108.

Weil was retested on September 26, 2011.  Id., ¶ 109.  The same three faculty members graded this exam, which the Plaintiff alleges is in conflict with the PA Program Student Handbook's requirement that a different faculty be used in a second evaluation.[8]  Pl.'s SOF, ¶ 109.  Weil again failed this examination and was denied reentry into the PA Program.  Defs.' SOF, ¶ 109.  Michael A. Rackover, a professor and interim Program Director of the Physician Studies Program in the School of Science and Health of Philadelphia University, independently reviewed the video recordings of both Weil's September 15, 2011 and September 26, 2011 examinations.  Id., ¶ 111–12.  Rackover concluded that

---

[8] The LHU PA Program Student Handbook states:

5.      The first unsatisfactory performance on a practical/oral will result in the exam being re-scheduled, with a different faculty member, at a time convenient for the faculty member[.]

Pl.'s SOF, Ex. C, at 24.

Weil failed both examinations.[9]  Id., ¶ 112.

On or about October 4, 2011, Smith received correspondence from Weil asking about appeal options regarding his dismissal, and responded by informing Weil that he could file an appeal of his dismissal with Provost David White.  Id., ¶¶ 113–14.  Weil appealed his dismissal by a letter to White, dated February 7, 2012, again stating that he "reported several medical billing irregularities to Program faculty" concerning Greenberg and McGraw.  Id., ¶ 115.  By letter dated February 21, 2012, White denied Weil's appeal noting that Weil had not met the requirements for reentry into the PA Program and that White found nothing in the process or documents regarding his dismissal that warranted overturning the decision.  Id., ¶¶ 116–17.

Subsequent to that determination, Weil filed the instant suit before this Court.  Weil claims that the above captioned Defendants retaliated against Weil for engaging in speech protected by the First Amendment to the United States

---

[9] In his report, Rackover wrote:

[Weil] did not uphold the standard of care of a physician assistant student by not concluding a satisfactory 30 minute complete screening practical exam.  Review of both DVD video exams did not demonstrate or meet criteria for quality assurance of an organized physical examination.  His assessment lacked a logical and precise understanding of criteria demonstrating a deficiency of competence in physical assessment of the patient.

Defs.' Docs., Ex. 53, at 8.

Constitution, a claim actionable against state actors through 42 U.S.C. § 1983.

The Defendants moved for summary judgment on Weil's claims.

## II.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could find for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When the court considers the parties' arguments, "[t]he evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor."  Id. at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment.  In re Bressman, 327 F.3d 229, 237 (3d Cir. 2003) (internal citations omitted).  The moving party may meet this burden by either (1) submitting positive evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case.  Id. at 331; see also Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  In

deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial or whether judgment as a matter of law is proper.  Anderson, 477 U.S. at 249.

### B.    Plaintiff's Dismissal from CMA Did Not Involve State Action

The Fourteenth Amendment to the United States Constitution provides that "no State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."  U.S. CONST. amend. XIV, § 1.  "The Fourteenth Amendment governs only state conduct, not that of private citizens."  Kach v. Hose, 589 F.3d 626, 646 (3d Cir. 2009) (Fisher, J.) (citing Rendell–Baker v. Kohn, 457 U.S. 830, 837–38 (1982)).  Actors who deprive persons of federal constitutional or statutory rights are subject to liability under 42 U.S.C. § 1983 if those acts are done "under color of any statute, ordinance, regulation, custom, or usage of a state."  Leshko v. Servis, 423 F.3d 337, 339 (3d Cir. 2005) (internal quotation omitted).

"[S]tate action is a threshold issue in any section 1983 case."  Bonenberger v. Plymouth Twp., 132 F.3d 20, 23 (3d Cir. 1997).  To recover under 42 U.S.C. § 1983, a plaintiff must establish: first, that the conduct complained of was committed by a person acting under color of state law; and, second, that the plaintiff was deprived of rights, privileges, or immunities secured by the United

States Constitution or laws of the United States.  See 42 U.S.C. § 1983; West v. Atkins, 487 U.S. 42, 48 (1988).  "In cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment."  United States v. Price, 383 U.S. 787, 794, n.7 (1966).

It is well-settled that private actors can act under color of state law for the purposes of 42 U.S.C. § 1983.  See, e.g., Donnell v. Corr. Health Servs., Inc., 405 Fed. App'x 617, 621 n.5 (3d Cir. 2010).  While this point of law is well-settled, its application to various factual scenarios is not.  The United States Supreme Court maintains: "[i]t is fair to say that 'our cases deciding when private action might be deemed that of the state have not been a model of consistency.'"  Lebron v. Nat'l R.R. Passenger Corp., 513 U.S. 374, 378 (1995) (quoting Edmonson v. Leesville Concrete Co., 500 U.S. 614, 632 (1991) (O'Connor, J., dissenting)).  Although the line between private and state action resembles a winding, murky river with ever-changing banks, our jurisprudence is replete with doctrines seeking to guide the traveler safely across the divide to firm footing on the proper shore.

The United States Court of Appeals for the Third Circuit has "outlined three broad tests generated by Supreme Court jurisprudence to determine whether state action exists: (1) whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state; (2) whether the private party

17

has acted with the help of or in concert with state officials; and (3) whether the state has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity." Kach, 589 F.3d at 646 (citing Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)) (internal quotations omitted).  "Under any test, '[t]he inquiry is fact specific.'" Id. (quoting Groman v. Twp. of Manalapan, 47 F.3d 628, 638 (3d Cir. 1995).

"The principle question at stake is whether there is 'such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the state itself.'" Leshko v. Servis, 423 F.3d 337, 339 (3d Cir. 2005) (quoting Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001) (internal quotations omitted)).  "[T]he essence of section 1983's color of law requirement is that the alleged offender, in committing the act complained of, abused a power or position granted by the state." Bonenberger, 132 F.3d at 24.  "[A]t base, 'constitutional standards are invoked only when it can be said that the government is *responsible* for the specific conduct of which the plaintiff complains.'" Edmonson v. Leesville Concrete Co., Inc., 500 U.S. 614, 632 (1991) (quoting Blum v. Yaretsky, 457 U.S. 991, 1004 (1988)).

For example, a private owner of a mobile home park was acting under color of state law when he acted with sheriff's deputies to seize an individual's property. Doldal v. Cook Cnty., 506 U.S. 56, (1992).  In contrast, a privately employed security guard at a public school who seduced a student was not acting under color of state law.  Kach, 589 F.3d at 647–49.  Nor was a bus driver for a private bus company under contract with a public school to drive the pupils, who subsequently abused those children.  See Black v. Indiana Area Sch. Dist., 985 F.2d 707, 647 (3d Cir. 2009).

Furthermore, "an otherwise private tort is not committed under color of state law simply because the tortfeasor is an employee of the state." Mark v. Borough of Hatboro, 51 F.3d 1137, 1150 (3d Cir. 1995).  "It is clear that under 'color' of state law means under 'pretense' of law.  Thus acts of officers in the ambit of their personal pursuits are plainly excluded." Screws v. United States, 325 U.S. 91, 111 (1945).  Judge Timothy K. Lewis expounded on these principles, writing for the Third Circuit:

> For instance, a state employee who pursues purely private motives and whose interaction with the victim is unconnected with his execution of official duties does not act under color of law . . . .  In contrast, off-duty police officers who flash a badge or otherwise purport to exercise official authority generally act under color of law . . . . Thus, the essence of section 1983's color of law requirement is that the alleged offender, in committing the act complained of, abused

a power or position granted by the state.

Bonenburger, 132 F.3d at 24 (internal citations omitted).

With these principles in mind, the Court applies the Third Circuit's stated inquiries to the facts of this case.  Weil does not delineate which specific state action doctrine inquiry he believes applies to these facts, but it is clear he does not suggest that the education of physician assistants is the exclusive prerogative of the state.  Rather, Weil's arguments center on the second and third tests for the state action doctrine.

Nevertheless, Greenberg was not a state actor in this scenario because his actions were motivated by his position as the manager of a private medical practice, not an officer or employee of the state.  Greenberg did not abuse "a power or position granted by the state."  Bonenberger, 132 F.3d at 24.  Indeed, "the focus of our inquiry is not whether the state exercises control over a putative state actor as a general matter, but whether the state has exercised control over the particular conduct that gave rise to the plaintiff's alleged constitutional deprivation."  Kach, 589 F.3d at 649.

Here, McGraw, who is not a defendant in this case and was only a private employee of CMA, was the primary impetus behind Weil's dismissal from CMA.  It was McGraw's interactions with Weil, her complaints about his behavior, and

her refusal to continue working with him that caused his removal from CMA.

Furthermore, Greenberg's involvement in McGraw's decision was exclusively as

her manager and the principal of CMA.  He merely supported his employee's

decision to terminate Weil from the practice, allegedly out of his concern for his

patients and the care CMA provided.  Greenberg's actions were motivated by

private concerns; he was not abusing a power granted by the state, and accordingly

was not a state actor for the purposes of 42 U.S.C. § 1983.

Regarding the third inquiry, LHU is not so interdependent with CMA such

that the Court should impute state action to CMA generally.  CMA is in every

respect a fully private medical practice.  There is no indication that its funding or

profits come from LHU.  The only connections between LHU and CMA are: 1)

CMA's principal, Greenberg, is also employed separately by the state at LHU; 2)

CMA accepts students from LHU's PA Program for their clinical work; and, 3)

several LHU faculty members also work part-time (approximately four hours per

week) at CMA, but are not employed or paid by CMA.  This is not

interdependence sufficient to establish the "symbiotic relationship" between the

state and CMA necessary to establish state action by a private entity.  See, e.g.,

Brentwood Acad., 531 U.S. at 311–12 (Thomas, J., dissenting).  Consequently, the

Plaintiff's generalized assertions of entanglement between the state and the private

21

medical practice are not sufficient to implicate the state action doctrine in the

context of the decisions of McGraw and Greenberg in their private practice of

medicine.

### C.   First Amendment Retaliation Claim

"The First Amendment [to the United States Constitution] prohibits

government officials from subjecting an individual to retaliatory actions . . . for

speaking out."[10]  Hartman v. Moore, 547 U.S. 250, 256 (2006).  To assert a

retaliation claim under the First Amendment to the United States Constitution,

applied to state actors through 42 U.S.C. § 1983, a plaintiff must establish three

elements: "(1) constitutionally protected conduct, (2) retaliatory action sufficient

to deter a person of ordinary firmness from exercising his constitutional rights, and

(3) a causal link between the constitutionally protected conduct and the retaliatory

action."  Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006).  "A

defendant may defeat the claim of retaliation by showing that it would have taken

the same action even if the plaintiff had not engaged in the protected activity."

---

[10] The text of the First Amendment provides:

Congress shall make no law respecting an establishment of religion, or prohibiting the
free exercise thereof; or abridging the freedom of speech, or of the press; or the right of
the people peaceably to assemble, and to petition the government for a redress of
grievances.

U.S. Const. amend. I.

Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).

In the case before the Court, there is no dispute that the Plaintiff's asserted conduct—speaking out about alleged ethical violations at the clinic—is constitutionally protected speech under the First Amendment. Nor is there a dispute that the remaining Defendants were state actors. Rather, this case turns on whether there was a causal connection between the Plaintiff's speech and the Defendants' conduct, and whether that conduct was sufficiently retaliatory.

To establish the requisite causal link, a plaintiff must prove either: "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." Cooper v. Menges, 541 Fed. App'x 228, 232 (3d Cir. 2013) (Fisher, J.) (citing DeFlaminis, 480 F.3d at 267) (internal quotations omitted). "Where there is a lack of temporal proximity, circumstantial evidence of a pattern of antagonism following the protected conduct can also give rise to the inference." Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000) (internal quotations omitted). "In the absence of that proof the plaintiff must show that from the 'evidence gleaned from the record as a whole' the trier of fact [sic] should infer causation." DeFlaminis, 480 F.3d at 267 (quoting Farrell, 206 F.3d at 281). Of course, "[t]he defendant must be aware of the protected conduct in order

to establish the requisite causal connection."  <u>Cooper</u>, 541 App'x at 232 (citing

<u>Gorum v. Sessoms</u>, 561 F.3d 179, 188 (3d Cir. 2009)).

Judge Morton I. Greenberg, writing for the Third Circuit, emphasized the

importance of this the causation inquiry:

> A court must be diligent in enforcing these causation requirements
> because otherwise a public actor cognizant of the possibility that
> litigation might be filed against him, particularly in his individual
> capacity, could be chilled from taking action that he deemed
> appropriate and, in fact, was appropriate.  Consequently, a putative
> plaintiff by engaging in protected activity might be able to insulate
> himself from actions adverse to him that a public actor should take.
> The point we make is not theoretical as we do not doubt that public
> actors are well aware that persons disappointed with official decisions
> and actions frequently bring litigation against the actors responsible
> for the decisions or actions in their individuals capacities, and the
> actors surely would want to avoid such unpleasant events.  Thus, it
> would be natural for a public actor to attempt to head off a putative
> plaintiff with the unwarranted expenditure of public funds.  Courts by
> their decisions should not encourage such activity and, by enforcing
> the requirement that a plaintiff show causation in a retaliation case,
> can avoid doing so as they will protect the public actor from
> unjustified litigation for his appropriate conduct.  In this regard we
> recognize that often public actors . . . must make a large number of
> decisions in charged atmospheres thereby inviting litigation against
> themselves in which plaintiffs ask the courts to second guess the
> actors' decisions.

<u>DeFlaminis</u>, 480 F.3d at 267–68 (footnote omitted).

Furthermore, the protected activity must be a *substantial* or *motivating*

*factor* in the alleged retaliatory action.  <u>See, e.g.</u>, <u>Ambrose v. Twp. of Robinson,</u>

Pa., 303 F.3d 488, 493 (3d Cir. 2002);  Baldassare v. New Jersey, 250 F.3d 188,

195 (3d Cir. 2001).  "To demonstrate that the protected activity was a 'substantial

factor,' a plaintiff can offer circumstantial evidence such as: (1) temporal

proximity between the act and response, Farrell v. Planters Lifesavers Co., 206

F.3d 271, 279 (3d Cir. 2000); (2) selective enforcement of rules against plaintiff,

Marrero v. Camden County Bd. Of Soc. Servs., 164 F. Supp. 2d 455, 470 (D.N.J.

2001); (3) defendant's behavior changed after the protected act, McCullough v.

City of Atlantic City, 137 F. Supp. 2d 557, 569 (D.N.J. 2001); and (4) defendant's

inconsistent reasons for taking adverse action against plaintiff, Waddell v. Small

Tube Prods., Inc., 799 F.2d 69, 73 (3d Cir. 1986)."  Dewees v. Haste, 620 F. Supp.

2d 625, 633 (M.D. Pa. 2009) (Kane, J.).

In the case at bar, Weil complains that numerous actions taken over an

extended period of time and by a variety of people were retaliation for his

complaints about various practices at CMA which he alleged were unethical.

Specifically, Weil claims that the following actions were retaliatory: (1) Weil's

dismissal from the CMA rotation; (2) the behavior contract presented to him by

the PA faculty on July 19, 2010; (3) the change of his grade for the 18-week

preceptorship from a "C" to an "E" in September 2010; (4) the denials of his grade

appeal prior to Erickson granting it; (5) the requirement that he satisfactorily

complete a physical examination in order to return to the program; (6) the conduct

and grading of that physical examination; and, (7) the denial of his appeal

concerning his dismissal from the program based on his performance in the

physical examination.

Aside from unsupported conclusory allegations, Weil has not presented

more than a scintilla of evidence supporting the causation element of these alleged

retaliatory actions by the LHU Defendants.  See Tindell v. Beard, 351 Fed. App'x

591, 594 (3d Cir. 2009) (finding bare, conclusory allegations insufficient to

survive summary judgment on constitutional claims).  Nor does Weil dispute facts

material to the disposition in this case by citing to specifics in the record.  "We

remind the [Plaintiff] that [his] obligation is to 'designate "*specific facts* [in the

record] showing that there is a genuine issue for trial," Celotex, 477 U.S. at 324

(emphasis added), and, as the Seventh Circuit has explained, 'Judges are not like

pigs, hunting for truffles buried in briefs.'  United States v. Dunkel, 927 F.2d 955,

956 (7th Cir. 1991)."  Tuno v. NWC Warranty Corp., 11-cv-3958, 2013 WL

3939487, *12 n.3 (E.D. Pa. July 21, 2013) (Dalzell, J.).

Instead of presenting specific facts to support his claims, Weil attempts to

paint the Defendants' actions with a broad brush, alleging that their reasonable

actions in the face of Weil's failure to complete PA Program requirements were

part of a coordinated course of retaliatory conduct.  Weil failed to present the

requisite evidence to support essential elements of his claims, and that there are no

disputed material facts that remain for trial.  See Scott v. Harris, 550 U.S. 372,

379–81 (2007) ("Where the record taken as a whole could not lead a rational trier

of fact to find for the nonmoving party, there is no 'genuine issue for trial.'").

Accordingly, this case is ripe for disposition as a matter of law at this juncture.[11]

The Court analyzes each of Weil's alleged retaliatory instances under the

applicable framework.

      1.   <u>Causation</u>

            *a.*    *Weil's Dismissal From CMA*

---

[11] While the Plaintiff maintains a court should not grant summary judgment on the second and third elements of the test for First Amendment retaliation, the law in this circuit is unequivocal:

> We reject the [plaintiffs'] contention that courts may never grant summary judgment on either the second or third steps of this analysis.  Although we have often noted that the first prong of the First Amendment retaliation test presents questions of law for the court while the second and third prongs present questions of fact for the jury, *e.g.*, *Curinga v. Ciy of Clariton*, 357 F.3d 305, 310 (3d Cir. 2004) (citing *Baldassare*, 250 F.3d at 195), only *genuine* questions of fact should be determined by the jury.  For example, in *Ambrose v. Township of Robinson, Pa.*, 303 F.3d 488, 496 (3d Cir. 2002), we held that judgment as a matter of law under Rule 50(b) should have been granted to the defendant where the plaintiff failed to present sufficient evidence that his protected activity was a substantial factor in his suspension.  The same principle applies in the summary judgment context under Rule 56.

Hill v. City of Scranton, 411 F.3d 118, 127 (3d Cir. 2005) (Roth, J.).

Weil claims that his dismissal from CMA was in retaliation for voicing his ethical concerns about CMA practices.  As previously discussed, however, McGraw was the primary force behind his dismissal from the CMA preceptorship, and she was not a state actor.  Nor did Weil demonstrate that Greenberg, who supported McGraw's decision, was a state actor for this purpose.  Accordingly, the dismissal is not actionable under § 1983 against Greenberg.  See Kach, 589 F.3d at 649.

Weil's LHU suspension from the CMA rotation was a mere necessary formality because McGraw refused to work with Weil.  See Defs.' Docs., Ex. 5. Bower informed Weil of this fact and that he should not report to CMA pending an investigation of both McGraw and Weil's grievances.  Weil further conceded in his deposition that Bower informed him that McGraw did not want to work with him and, as a result of McGraw's sentiments, he was suspended from CMA.

Weil does not demonstrate any retaliatory motive from an LHU PA Program faculty member in connection with this preliminary suspension.  In fact, in response to McGraw's unwillingness to work with Weil and Weil's grievances, the PA Program faculty scheduled a meeting in order to allow Weil to further explain the dispute.  Defs.' SOF, ¶¶ 45–47.  In no way did the Defendants retaliate or act to suppress Weil's speech at the juncture, but rather encouraged a dialogue

28

between all parties to the dispute.

Furthermore, while the suspension from the rotation was in close proximity to Weil's alleged voicing of ethical violations to McGraw and Greenberg, Weil produces no evidence that Bower was aware of his constitutionally protected conduct at this junction. See Cooper, 541 App'x at 232. Accordingly, Weil did not present evidence indicating that the LHU PA Program faculty harbored a retaliatory motive when informing Weil that McGraw would no longer work with him at CMA. His dismissal was not a university action, but a decision by a private individual.[12]

### b.    Behavior Contract

Weil claims that the behavioral contract the PA Program faculty presented him around July 19, 2010, after his meeting with McGraw and the faculty on July 8, 2010, constituted retaliation for his speech about CMA's allegedly unethical billing practices. Weil, however, offers little in the way of evidence to support these assertions or to establish causation necessary to survive summary judgment.

As an initial matter, Plaintiff does not present evidence that the majority of

---

[12] Because Weil's dismissal from CMA was not a university action and because it involved his training performance failures and was not a disciplinary offense, neither the regulations of the Pennsylvania State System of Education for Student Disciplinary Due Process Requirements, 22 Pa. Code § 505.1 *et seq.*, nor LHU's own Student Code of Conduct contained in the Student Handbook (Defs.' Docs., Eisenhauer Decl., Ex. D, at 63–73), apply to the events surrounding Weil's dismissal.

the faculty members adopting the behavior contract were even aware of Weil's protected speech.  Weil claims that he expressed general concerns to Defendants Leffert and Eisenhauer before McGraw refused to continue working with him, but concedes that he did not provide them with any specific allegations of fraud or ethical irregularities.  See Defs.' Docs., Ex. 38, Weil Dep. Vol. I, 156–60, 167–69. Plaintiff also claims that he first described his ethical concerns in detail at the July 8, 2010 meeting with Defendants Leffert and Bower, and Steve Harris, another faculty member.  See id. at 175–76.  There is no evidence that Leffert, Bower, or Harris discussed Weil's ethical concerns before the contract was discussed and presented to Weil at the July 19, 2010 meeting.  Again, "[t]he defendant must be aware of the protected conduct in order to establish the requisite causal connection."  Cooper, 541 App'x at 232.

Moreover, while the majority of the faculty agreed with the contents of the behavior contract as it was presented to Weil on July 19, Leffert and Bower did not.  Defs.' Docs, Ex. 24, Leffert Dep. 46–47, 88, Ex. 11; Ex. 1-4, Bower Dep., 58–59.  Thus, two of three people who knew of the specifics of Weil's complaints at CMA at this juncture did not agree with the contract.  There is no evidence that the third, Harris, who is not a defendant, was instrumental in convincing the rest of the faculty to adopt it.  Therefore, neither Weil nor the record demonstrate that the

majority of the faculty voting to adopt the behavior contract could be motivated by a desire to retaliate against Weil for his report of misconduct at CMA because they had no knowledge of Weil's speech at that time.  See Cooper, 541 App'x at 232. If anything, this evidence demonstrates that those faculty members that had knowledge of Weil's claims *did not* have a retaliatory motive, as they objected to elements of the behavior contract with Weil as being too harsh.

Rather, the record makes clear that the PA Program faculty evaluated Weil's poor performance at CMA based on many of the incidents and complaints McGraw experienced, and any discussion and dissent among the faculty was over how to interpret Weil's clinical failings and what weight to ascribe each incident. See Defs.' Docs., Ex. 2.  The Defendants' present largely consistent reasons for their treatment of the situation.  See Waddell, 799 F.2d at 73.  The Defendants also responded in the exact same manner after Weil's protected act at this juncture as they did the first time they presented Weil with a behavioral contract in 2009, when he manifested similar unprofessional behaviors entirely unrelated to the incident at bar.  See McCullough, 137 F. Supp. 2d at 569.

Furthermore, the record indicates that the PA Program faculty was considering the behavior contract and its contents well before Weil's July 8 meeting with Leffert, Bower and Harris—before Weil had reported *any* specific

31

allegation of misconduct to PA Program faculty.  See Defs.' Docs., Eisenhauer Decl. ¶ 17, Ex. F; Leffert Dep., Ex. 8.  A defendant's "proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."  Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001).

Weil further complains that "[n]o investigation into Plaintiff's assertions was undertaken, with Defendants relying on gut feelings and personal opinions that Plaintiff was wrong."[13]  Pl.'s Br. Opp'n 9, Jan. 6, 2014, ECF No. 64.  Weil, however, does not enjoy a "constitutional right to force the government to listen" to his views or act on them.  Minnesota State Bd. for Cmty. Colleges. v. Knight, 465 U.S. 271, 283 (1984); see also Smith v. Arkansas State Highway Emp., Local 1315, 441 U.S. 463, 465 (1979) ("[T]he First Amendment does not impose any affirmative obligation on the government to listen, [or] to respond [to the exercise of First Amendment rights.]").  Accordingly the Defendants are entitled to summary judgment on this issue.

---

[13] Furthermore, it is not entirely clear what Weil hoped to achieve by reporting the allegedly unethical conduct to the PA Program faculty.  LHU had no authority to impose sanctions on CMA or its employees for conduct taken in the course of their private medical practice.  Weil could have reported this conduct to a district attorney, state licensing board, either the Insurance Fraud Section or the Medicaid Fraud Control Unit of the Pennsylvania Office of the Attorney General, or another applicable agency.  While Weil voiced his intent to do so on several occasions in a threatening manner, he did not do so.

*c.     Change of Grade*

As previously articulated, approximately two months after the faculty presented Weil the behavior contract in July 2010, Weil applied to graduate based in part on the fact that his transcript showed a "C" for the 18-week preceptorship. Although Weil knew that the grade was a placeholder so that he could continue to receive financial aid and that he had not completed the preceptorship course, he initially asserted that Leffert's denial of his application for graduation and change of grade from "C" to "E" was in retaliation for his speech.

While Weil initially alleged this was retaliatory, Weil did not proffer any evidence demonstrating that this was a retaliatory act rather than an appropriate act in light of the circumstances, LHU's requirements for graduation, and LHU policy. Weil did not address this issue in his brief in opposition to the Defendant's motion, nor did Weil demonstrate any material fact in dispute that precludes judgment as a matter of law on this point.

Furthermore, Leffert's denial of his application and the grade change occurred over two months after Weil met with the faculty and voiced his concerns about CMA—the decision was not made in close proximity to the protected speech.  See Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 760 (3d Cir. 2004) (holding that a two month lapse between protected conduct and an

adverse action was not sufficient to raise an inference of causation).  Leffert

merely denied Weil's application to graduate because he did not finish the

required course work, a fact Weil does not dispute.  Accordingly, Leffert changing

Weil's grade from "C" to "E" and his denial of his graduation application do not

support his claim of retaliation.

### d.    Interim Grade Appeals

Similarly, Weil argues that the denial of his grade change appeals by

Leffert, Eisenhauer, and Rose-Colley were retaliatory without demonstrating

evidence to support this assertion or demonstrating disputed facts that require

resolution at trial.  First, Weil cannot establish an inference of causation based on

proximity, because months separated Weil's July 19, 2010 meeting and initial

disclosure of his speech from these three decisions on his grade appeal.  Leffert's

decision issued six months after the meeting (January 26, 2011); Eisenhauer's

decision issued seven months after the meeting (February 15, 2011); and Rose-

Colley's decision issued eight months after the meeting (March 16, 2011).  See,

Defs.' Docs., Eisenhauer Dep., Ex. 8.  These undisputed facts raise no inference of

causation for retaliatory conduct.  See Williams, 380 F.3d at 760.

Second, Weil claims that he was not provided an impartial hearing required

by the Pennsylvania State System of Education for Student Disciplinary Due

Process Requirements, 22 Pa. Code § 505.1 *et seq.*, or LHU's own Student Code

of Conduct contained in the Student Handbook.[14]  The text of these provisions

make clear, however, that they apply to disciplinary offenses and the procedures

for corresponding disciplinary sanctions.[15]  Here, Weil was not faced with any

disciplinary action.  Rather he instituted a grade appeal—a process with separate

procedures in the Student Handbook that were followed.  See Defs.' Br. Reply 31,

Nov. 31, 2014, ECF No. 68.  Furthermore, Weil produced no instances where a

student was provided disciplinary procedures, rather than a grade appeal process,

in circumstances similar to this case, rendering Weil unable to demonstrate that his

appeal process was other than ordinary.

### e.  *Physical Exam Requirement*

Weil complains that Erickson retaliated against him, even though she

granted his grade appeal, by requiring that he successfully complete a physical

---

[14] See Defs.' Docs., Eisenhauer Decl., Ex. D, at 63–73.

[15] The statute provides:

Each university president, with trustee approval, shall create rules of student conduct and judicial procedure, consistent with this chapter which shall provide substantive rules that define with reasonable specificity disciplinary offenses, penalties or sanctions and procedural guidelines to adjudicate rules violations.

22 Pa. Code § 505.1.

examination before returning to the PA Program.  Defs.' Docs., Ex. 38, 39, Weil

Dep. Vol. I, 218; Weil Dep. Vol. II, 10.  He argues that this requirement violated

the LHU PA Program Student Handbook.  Nevertheless, Weil provides no

accurate citation to the handbook that would suggest this requirement was in

contravention of LHU policy.

Furthermore, it was not an unusual or unreasonable requirement.  Students

who had been absent from the PA Program for an extended period of time were

required to demonstrate that their examination skills were satisfactory before being

allowed to return.  Weil himself was required to pass nearly the same physical

examination test before returning to the program after his medical leave absence.

This demonstrates the Defendants behaved consistently toward Weil both before

and after his protected speech, and that they consistently rather than selectively

enforced LHU policy.  See, e.g., Marrero, 164 F. Supp. 2d at 470 (stating that the

selective enforcement of rules against a plaintiff may indicate retaliation);

McCullough, 137 F. Supp. 2d at 569 (discussing a defendant's changed behavior

after the protected act as indicative of retaliation).

### f.    Physical Examination and Grading

Weil also contends that Smith, Leffert, and Bower retaliated against him in

the manner in which the practical physical examination was administered and

36

graded.  Weil claims that requiring the tests was unusual, that they were not conducted in accordance with the PA Program Student Handbook, and that the testing was performed in a biased manner.  Weil has not, however, demonstrated evidence such that a reasonable juror could find in his favor on these claims, or disputed any material fact such that judgment as a matter of law is inappropriate. Weil fails to demonstrate facts for any criteria suggesting a causal relationship between his speech and this alleged retaliatory action.

First, the timing of this alleged retaliation is not unusually suggestive, as the testing occurred in September 2011, over a year after the July 19, 2010 meeting. See, e.g., Williams, 380 F.3d at 760.  Second, the record does not demonstrate a pattern of intervening antagonism between Weil, Smith, Leffert, and Bower.  It is undisputed that Weil had not met with or substantially communicated with these faculty members since the July 19, 2010 meeting.  Defs.' Docs., Ex. 39, Weil Dep. Vol. I, 217–18.  Furthermore, Leffert and Bower demonstrated behaviors antithetical to any retaliatory motive when they opposed the behavioral contract the faculty presented to Weil and advocated for less onerous conditions for Weil to resume his studies.  Defs.' Docs., Ex. 25, Leffert Dep., 46–47; Ex. 4, Bower Dep. 58–59.

Third, the testing was not unusual and the Defendants' behavior remained

consistent both before and after Weil's speech in this respect.  Students who had

been absent from the PA Program for a period of time were required to

demonstrate satisfactory physical examination skills before they returned to the

program, to ensure that the student's skills are sufficient to return to work in a

clinical setting.  See Defs.' Br., at 32.  Weil himself underwent prior similar

testing after his medical leave and before his protected speech, demonstrating

consistent treatment .  See McCullough, 137 F. Supp. 2d at 569.  Moreover, he did

not demonstrate factually that this testing was unusual, not required, or disparate

in any way.

Fourth, the testing did not contravene the testing policy in the PA Program

Student Handbook.  Weil cites to a section of the handbook that articulates three

testing opportunities for a student that had difficulty passing an element of the PA

Program's required course work.  See, supra, n.7.  Weil attempts to assert that,

because he was only given two attempts to pass the examination, the faculty

contravened the text of the PA Program Student Handbook.  It is clear from the

Student Handbook, however, that requirement applied to tests that were required

as part of the actual PA Program curriculum, not to a test required for reentry into

the program itself.  Accordingly, the stated three testing occurrences were not a

requirement for Weil's situation.

Finally, the record demonstrates conclusively that the testing was performed in a fair and unbiased manner.  Before the first examination, Defendant Smith informed Weil of the nature of the exam, cited similar exams he had taken in the past, advised him of the grounds for failure, and provided him with the cover sheet for the exam with the grading criteria and the time-frame for performance.  Defs.' Br., at 32–33.  On September 15, 2011, Weil performed the examination in Lewis' presence, and Leffert and Bower subsequently scored Weil's exam by video.  All three evaluators independently failed him.  Smith then informed him of the results and the reasons for his failure.  Id.

Weil was then given a second opportunity, and informed that if he did not pass that exam, he would be dismissed from the program.  Id.  Before this exam, Smith reviewed the specific information on the exam with Weil, specified the actions or omissions that caused him to fail the first time, and outlined other errors that could cause failure.  The same three evaluators again independently reviewed Weil's performance on the second test.  He again failed.  Rackover, the independent expert who reviewed the recordings of Weil's examination, also agreed with the evaluators' conclusions that Weil failed the examination.

Weil does not dispute these material facts and makes no showing of irregularity or causation sufficient to support a claim for retaliation on this issue.

Accordingly, the Defendants are entitled to judgment as a matter of law on this contention.

### g.    Appeal of Dismissal

Finally, Weil asserts that his dismissal from the PA program was retaliatory because Smith did not have the authority to dismiss him, and that White did not adequately investigate his appeal.  Regarding Smith's action to dismiss Weil, he offers little in the way of retaliatory motive other than conclusory allegations. Furthermore, regardless of Smith's position and alleged lack of authority, Smith was implementing the directives of both provosts Erickson and White, who maintained that Weil could return to the program only if he had met certain conditions including completing his practical examinations.  Defs.' Br., at 36. Thus, the provost directed and confirmed Smith's decisions, rendering the question of her authority irrelevant for this inquiry.

Regarding Weil's contention that White did not adequately investigate his appeal and denied it from retaliatory motive, Weil similarly offers no facts, rationale, or support for his contention that indicates causation sufficient to survive summary judgment.  White succeeded Erickson as provost and did not hold that position during the main course of these events.  He was not present at any of the meetings where Weil engaged in his protected speech, nor does Weil

offer any facts suggesting that White had retaliatory motive or circumstantial

evidence thereof.  Weil's disagreement with White's decision on the merits of his

appeal, without more, is insufficient to establish an inference of retaliatory

causation.

### 2.    Adverse Action Not Sufficient to Deter

Weil further claims that Bower retaliated against him when he provided him

with erroneous appeal information by stating in a letter that Weil had ten (10) days

to appeal the faculty's decision regarding the requirements for his program

completion, which was not consistent with the student handbook.  Pl.'s Br., at

13–14.  While Weil did not demonstrate that the faculty treated other students

differently, because this information was inconsistent with the dictates of the PA

Program Student Handbook, the Court will assume causation for the purposes of

summary judgment and proceed to review this claim under the adverse action

inquiry.

For retaliatory action to be recoverable under the First Amendment, the

conduct must be "sufficient to deter a person of ordinary firmness from exercising

his constitutional rights."  Thomas, 463 F.3d at 296.  "'It would trivialize the First

Amendment to hold that harassment for exercising the right of free speech was

always actionable no matter how unlikely to deter a person of ordinary firmness

from that exercise.'"  Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir. 2000)

(quoting Bart v. Telford, 677 F.2d 622, 625 (7th Cir. 1982)).  Accordingly, "*de*

*minimis* or trivial acts do not amount to actionable adverse actions."  Schneck v.

Saucon Valley Sch. Dist., 340 F. Supp. 2d 558, 569 (E.D. Pa. 2004) (citing

Brennan v. Norton, 350 F.3d 399, 419 (3d Cir. 2003)).  For example, "courts have

declined to find that an employer's actions have adversely affected an employee's

exercise of his First Amendment rights where the employer's alleged retaliatory

acts were criticism, false accusations, or verbal reprimands."  Brennan, 350 F.3d at

419 (internal quotations omitted).

    Bower's failure to provide Weil with the accurate appeal information, even

assuming that it was motivated by a retaliatory aim rather than a mere mistake,[16]

does not rise above a trivial act that is unlikely to deter a person of ordinary

firmness from exercising his or her First Amendment rights as a matter of law.

See id.  Indeed, a person of ordinary firmness could find the correct appeal

information in the PA Program Student Handbook with ease and still enjoy both

his right of appeal within the institution and the exercise of his First Amendment

rights.  That information was readily available to Weil and Bower's statement is

---

[16] Weil himself characterizes Bower's action as "her *incompetence* in handling Plaintiff's matter."  Pl.'s Br., at 9–10 (emphasis added).

42

not adverse action sufficient to support a constitutional claim.  The Court will not trivialize First Amendment jurisprudence by exalting such an inconsequential act to constitutional proportions.[17]

Finally, Weil specifically asserts for the first time in his Brief in Opposition to Summary Judgment that Eisenhauer failed to respond to two of his requests for audio recordings of the July 8 and July 19, 2010 meetings, which he alleges was retaliatory action.  The Third Circuit, however, has consistently "held failures to act cannot form the basis of a valid § 1983 claim."  Kaucher v. Cnty. of Bucks, 455 F.3d 418, 433 n.11 (3d Cir. 2006) (citing a litany of Third Circuit cases supporting this point of law); see also Monn v. Gettysburg Area Sch. Dist., 553 Fed. App'x 120, 122 (3d Cir. 2014).  Therefore, Eisenhauer's alleged *inaction* cannot support Weil's claim of "retaliatory *action* sufficient to deter a person of ordinary firmness from exercising his constitutional rights."  Monn, 553 Fed. App'x at 122 (quoting Thomas, 463 F.3d at 296) (internal quotations omitted).

---

[17] Nor did Bower's erroneous information harm Weil, as his appeal was ultimately accepted and considered by PA Program faculty.  Furthermore, because Weil cannot demonstrate a causal connection between the other alleged retaliatory acts and his protected speech, Weil cannot demonstrate a course of conduct with retaliatory motive, and this de minimus claim standing along does not suffice to satisfy the retaliation standard as a matter of law.  See, e.g., Smith v. Central Dauphin Sch. Dist., 355 Fed. App'x 658, 668 (3d Cir. 2009).

Additionally, while the Court is cognizant that the test is objective, rather than subjective, it is worth noting that Weil *was not in fact deterred* from exercising his First Amendment rights, as he continually threatened to report CMA's alleged misconduct to government authorities throughout this process despite failing to ultimately do so.

**D.**     **Withdrawn Conspiracy Claims**

Although Weil plead claims of civil conspiracy under 42 U.S.C. §§ 1985

and 1986, he voluntarily withdraws them at this juncture.  See Pl.'s Br., at 15.

Therefore, the Court does not address them here and they are deemed withdrawn.

**III.**     **CONCLUSION**

The Defendants are entitled to summary judgment on Weil's claims.

Greenberg and CMA were not state actors in dismissing Weil from his clinical

rotation at the private practice.  Weil cannot sustain First Amendment retaliation

claims as a matter of law against the LHU Defendants.  Accordingly, the

Defendants' Motion is granted and Weil's case is dismissed.

An appropriate Order follows.


BY THE COURT:


/s Matthew W. Brann
Matthew W. Brann
United States District Judge